## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA

_____

JIMMIE TOWNSEND and DAN LEVAN,

Plaintiffs,

v.

BP, PLC, BP AMERICA, INC.,
BP CORPORATION NORTH AMERICA, INC.,
BP COMPANY NORTH AMERICA, INC.,
BP EXPLORATION & PRODUCTION, INC.,
BP PRODUCTS NORTH AMERICA, INC.,
ANADARKO PETROLEUM CORP., MOEX
OFFSHORE 2007 LLC, TRANSOCEAN, LTD,
TRANSOCEAN, INC., TRANSOCEAN
OFFSHOREDEEPWATER DRILLING, INC.,
TRANSOCEAN DEEPWATER, INC.,
HALLIBURTON ENERGY SERVICES, INC.,
CAMERON INTERNATIONAL CORPORATION
f/k/a COOPER CAMERON CORPORATION,
and M-I, LLC,

Defendants.
_____

)  CLASS ACTION
)  Case No. _____
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

### CLASS ACTION COMPLIANT

### I.  INTRODUCTION

Plaintiffs Jimmie Townsend and Dan Levan, ("Plaintiffs"), individually and as representatives of the class defined herein (the "Class"), file this cause of action against the Defendants BP, PLC; BP America, Inc.; BP Corporation North America, Inc.; BP Company North America, Inc.; BP Exploration & Production, Inc.; BP Products North America, Inc.; Anadarko Petroleum Corp.; Moex Offshore 2007, LLC; Transocean Ltd.; Transocean, Inc.; Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Halliburton Energy Services, Inc.; Cameron International Corporation f/k/a Cooper Cameron Corporation; and M-I, LLC, and state as follows:

1

1.   Plaintiffs are owners of property adjacent to the Gulf of Mexico on the southern shore of the State of Alabama.  They bring this class action on behalf of themselves and all others  similarly situated against Defendants for losses and damages arising out of the catastrophic and avoidable oil spill off the Gulf Coast caused by the April 20, 2010 explosion and fire aboard the Deepwater Horizon oil rig ("Deepwater Horizon"), and the subsequent sinking of that rig and the continuous discharge of oil into the surrounding water.

2.   On April 20, 2010, the Deepwater Horizon, an oil rig in the Gulf of Mexico, exploded and caught fire. It burned for two days before tipping into the sea. As the Deepwater Horizon rig sank, it broke off the riser, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the Gulf waters.

3.   Tens of thousands of barrels per day of crude oil have been leaking from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. The growing, fast-moving, rainbow colored smear is large enough to be visible from outer space, covering tens of thousands of square miles, and presently spreading with the wind and currents towards the Alabama, Louisiana, Mississippi, and Florida coastlines.

4.   The spilled oil has already caused significant damage to the beachfront and coastal areas of Alabama and the Gulf of Mexico, where Plaintiffs' and the Class Members' property is located. With the wellhead unabated gushing hundreds of thousands of gallons of oil per day into the waters near Alabama, Plaintiffs and Class Members are suffering and will continue to suffer serious losses as more specifically set out below.

## II. PARTIES

5.   Jimmie Townsend and Dan Levan are Alabama residents who jointly own a condominium adjacent to the Gulf of Mexico in Gulf Shores, Alabama. Said condominium was purchased in 2010 before the oil spill and it is used for personal enjoyment, an investment and potential rental. As a result of the events described herein, Plaintiffs have suffered ascertainable losses and damages.

6.    Defendant BP, PLC is a British corporation, organized under the laws of the United Kingdom, doing business in the State of Alabama and throughout the United States. BP is one of the world's largest oil companies.

7.    Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Alabama and throughout the United States. BP America, Inc. is a subsidiary of BP, PLC.

8.    Defendant BP Corporation North America, Inc. (formerly BP Amoco Corporation), is an Indiana corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States. BP Corporation North America, Inc. is a subsidiary of BP America, Inc.

9.    Defendant BP Company North America, Inc. is a Delaware Corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Alabama and throughout the United States. BP Company North America, Inc. is a subsidiary of BP Corporation North America, Inc.

10.   Defendant BP Products North America, Inc. is a Maryland corporation, with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States. BP Products North America, Inc. is a subsidiary of BP Company North America, Inc.

11.     Defendant BP Exploration & Production, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois and executive address in Houston, Texas, but doing business in the State of Alabama and throughout the United States. BP Exploration & Production, Inc. was the lease operator of the Deepwater Horizon at the time of the explosion.

12.     Defendants BP America, Inc., BP Corporation North America, Inc., BP Company North America, Inc., BP Products North America, Inc., and BP Exploration & Production, Inc. are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they, together with the said parent, shall be referred to herein collectively as "BP."

13.     BP holds the lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production-related operations at the Macondo site in the Mississippi Canyon Block 252 section of the outer continental shelf in the Gulf of Mexico. As of April 20, 2010, BP operated the Macondo oil well that is the source of the current oil spill.

14.     Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas, but doing business in the State of Alabama and throughout the United States. Anadarko is an oil and gas exploration and production company that owns a 25% interest in the Macondo well at Mississippi Canyon Block 252.

15.     Defendant MOEX Offshore 2007, LLC ("MOEX") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX Offshore 2007 holds a 10% interest in the Macondo well at Mississippi Canyon Block 252.

16.     Defendant Transocean Ltd. is a Swiss corporation doing business in the State of Alabama and throughout the United States. Transocean Ltd. is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

17.     Defendant Transocean, Inc. is a Cayman Islands corporation with its principal places of business on Grand Cayman, Cayman Islands, and in Houston, Texas, but doing business in the State

of Alabama and throughout the United States. Transocean, Inc. is a wholly-owned subsidiary of Transocean Ltd.

18.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States. Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd.

19.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States. Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd. Transocean Offshore Deepwater Drilling, Inc. is the world's largest offshore drilling contractor.

20.     Defendants Transocean, Inc., Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and they, collectively with said parent, shall be referred to herein collectively as "Transocean."

21.     Transocean owned, and BP was leasing and operating, the Deepwater Horizon as it performed production well completion operations on the Macondo well on the outer continental shelf off the Gulf Coast, at the site from which the oil spill now originates.

22.      At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

23.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas and one in Dubai, United Arab Emirates, but doing business in the State of Alabama and throughout the United States. Halliburton is one of the world's largest providers of products and services to the energy industry. Aboard the Deepwater Horizon, Halliburton was engaged in the cementing operations of the well and well cap.

24.     Defendant Cameron International Corporation f/k/a Cooper Cameron Corporation

("Cameron") is a Delaware Corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas and process industries. Cameron manufactured and/or supplied the Deepwater Horizon's blowout preventer valve ("BOP") that failed to activate at the time of the explosion.

25.     Defendant M-I, LLC ("M-I") is a Texas corporation with its principal place of business in Houston, Texas. M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services. M-I provided the drilling fluids for the Deepwater Horizon at the time of the explosion.

26.     Plaintiff asserts that upon information and belief, that all Defendants committed wrongs which combined and concurred to cause the damage complained of herein.

### III. JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § l332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

28.     Jurisdiction is also appropriate under 28 U.S.C. § 1331, because the claims asserted by plaintiffs arise under the laws of the United States of America, including the laws of the State of Alabama which have been declared, pursuant to 43 U.S.C. § 1331 (f)(l) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated. Title 43 U.S.C. § 1331 (l) extends exclusive Federal jurisdiction to the outer continental shelf.

29.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy.

30.     This Court's venue over this action is proper under 28 U.S.C. § 139l(a)(2) because a substantial part of the property that is the subject of this action is situated in this district.

## IV. FACTUAL ALLEGATIONS

31. The Deepwater Horizon was an ultra-deepwater dynamic positioned semisubmersible oil rig built in 2001. It was owned by Transocean and leased to BP through September 2013. It was one of the largest rigs of its kind.

32.     BP leased the Deepwater Horizon to drill an exploratory well at the Macondo prospect site in Mississippi Canyon Block 252, on the outer continental shelf.

33.     On April 20, 2010, the Deepwater Horizon was creating a cement seal and plug of  the wellhead as part of the final phases of turning the Macondo well from an exploratory well into a production well. "Cementing" a wellbore is delicate work that carries the risk of a blowout, which is the uncontrolled release of gas and oil from the well.

34.     During the course of this cementing work, an explosion occurred on the Deepwater Horizon and it caught fire, causing the deaths and injuries of many workers on the rig. Investigators believe the explosion was a blowout, a sudden surge of gas into the wellbore, likely caused by the cementing work being attempted on the Deepwater Horizon rig.

35.     Investigations and testimony have revealed a complex cascade of deep-sea equipment failures and procedural problems thought to have caused the explosion of the Deepwater Horizon and the subsequent oil spill.

36.     Even before the catastrophic events of April 20, 2010, Defendants had had trouble with the Macondo well. In October 2009, a "kick" of unwanted natural gas got into the well. In March of this year, workers again discovered gas seeping into the well, causing them to have to backtrack and redrill. In some places the material the rig was drilling into was so brittle that gallons of drilling mud escaped into the porous rock around the well. All of these incidents caused delay and expense for

7

Defendants. At the time of the subject explosion, drilling at Macondo was already weeks behind schedule and costing BP $1 million per day in rig lease and contractor fees. Testimony of workers on the rig subsequent to the explosion illustrates the time pressure that BP was pressing on them as it rushed workers to double up on tasks and finish quickly so the well could be sealed and the Deepwater Horizon moved to another well prospect and to begin searching for more oil.

37.     Inappropriate shortcuts had already been taken on the rig. Companies often use two pipes, one inside the other, sealed together, with the smaller pipe extending into the well. The double pipe setup means that gas has to break through cement and the seal connecting the pipes before it can reach the surface and blowout. But the dual-pipe system is more expensive, so BP chose instead to use a single pipe.

38.     With the reduced safety precautions of a single pipe setup, the integrity of the cement seals was all the more crucial. According to sources on the rig, Defendant Halliburton was using a new type of cement to seal the wellbore - a mix infused with nitrogen and other chemicals, supposedly able to set faster than standard cement. But the chemicals added to the new cement can create substantial amounts of heat, which can thaw crystallized gas so that it releases up the wellbore in blowouts like the one aboard the Deepwater Horizon. The new cement could also have been a factor instigating the blowout.

39.     Shortly before dawn on the day of the explosion the Macondo well failed a key "negative pressure test," done to make sure underground gas could not seep into the well. Failure meant the well might be leaking. Workers ran a second negative pressure test; the well failed again. In recent government hearings, BP has since admitted that there were clear warning signs of a "very large abnormality" in the well.

40.     Despite these warning signs, BP declined to run an important standardized cement bond log test to check the integrity of the cement, or run a "bottoms up" test, circulating mud through the well

to bring the deepest mud to the surface and check for the presence of gas. Both tests could have prevented the disaster by alerting Defendants to the presence of gas in the well and the risk of a blowout.

41. According to subsequent testimony of employees who were on the rig, by mid-morning on the day of the explosion there was "confusion", a "skirmish" and disagreement among the officials from BP, Transocean and Halliburton as to how to proceed with the well drilling plan. But despite these disagreements and two test failures indicating the well could have a dangerous leak or pressure imbalance, the cement bond log and "bottoms up" tests were skipped and work resumed on the well.

42.     Heavy drilling fluid was pumped out of the riser pipe connecting the wellhead with the rig, replaced with lighter, less-dense seawater in preparation for placing the last cement plug in the wellbore. Without heavy drilling fluid to exert downward pressure in the wellbore, any leak in the well could turn dangerous very quickly, with only relatively light seawater blocking its path up the wellbore, through the riser and to the surface.

43.     The last cement plug was still missing from the wellbore just before 10 p.m. on April 20th, when drilling fluid pushed by rapidly expanding underground gas started kicking up uncontrollably through the well, with nothing but seawater to stop it.

44.     Desperate rig workers tried to activate the BOP, which was installed to squeeze off the surge in just such an emergency. But, as reports and testimony have shown, hydraulic fluid leaking from a loose fittings hindered the activation of the BOP's powerful shear rams to cut the piping and cap the blowout. Moreover, the BOP's crucial annular valve may have been damaged days earlier, according to a worker who had been on the rig. To make matters even worse, investigators found a battery had gone dead in at least one of two control pods meant to automatically switch on the BOP in an emergency.

45.     After the explosion, the resulting fire on the rig burned for two days, and the rig began to list

progressively more until it finally sank on April 22, 2010. The Deepwater Horizon had been

connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the Deepwater

Horizon sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before

finally tearing away from it completely. The riser, bent into a crooked shape underwater, now

extends from the well to 1,500 feet above the seabed and then buckles back down. Oil is flowing out

from the open end of the riser and from two places along its length.

46.     The BOP was never activated. Workers spent a day trying to close one of the rams

without realizing it had been replaced by a useless test part. Investigations later showed that the

BOP had been modified and the schematic diagrams for the device to have been used by the rig

workers were inaccurate.

47.     At the May 12,2010 Senate hearings on the causes of the explosion and spill, testimony

showed that the BOP may have failed for four reasons: after-market modifications to it may have

reduced the number of shears that could close the well; a hydraulic leak may have disabled it; the

shear rams may not have been powerful enough to cut through the riser pipe, or may have hit a

section of pipe that was too thick to cut; and the battery power to one or more of its activator

switches may have died.

48.     If the BOP on the wellhead had been functional, it could have been manually or

automatically activated just after the explosion, cutting off the flow of oil at the wellhead,

limiting the spill to a minute fraction of its current severity and thereby sparing Plaintiffs and

Class Members untold millions of dollars in losses and damage.

49.     The risks of offshore drilling are well known to Defendants, and are especially high in the

Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as

the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

50.     Moreover, all Defendants knew the work that the Deepwater Horizon was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

51.     Although blowouts due to other causes hsve been on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico. Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined in the study occurred in the Gulf of Mexico.

52.     All Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work performed by Defendant Halliburton. During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oi11eaked from the site for ten weeks, spreading damage over 200 miles from the well site.

53.     The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the sea floor. This is one of the deepest wells in the Gulf of Mexico. Defendants were aware of the high risk of blowouts from such deep drilling.

54.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Defendants were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or a backup BOP.

55.     A 2004 study by Federal regulators showed that BOPs may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 14 rigs studied in 2004 had BOPs able to

squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

56.     Defendants could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it. In fact, in 2000 the MMS cautioned Defendants and other oil rig operators that it considered a backup BOP activation system to be "an essential component of a deepwater drilling system." Despite that notice, and although the backup trigger is a common drill-rig requirement in other oil-producing nations, including other areas where Defendant BP operates, the Deepwater Horizon was not equipped with this backup remote BOP trigger.

57.     Nor was the Deepwater Horizon equipped with a second, backup BOP, as newer rigs increasingly are. The Deepwater Horizon only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it may have done in this case.

58.     Worst of all, Defendants knew that this particular well posed a particularly strong blowout risk. The Macondo well had been shut down for fear of an explosion after a large release of natural gas just weeks before the fatal explosion at issue here. Rig workers reported that the Macondo well had consistently proven problematic, with pockets of natural gas regularly kicking up the drill pipes in highly flammable bursts. The government had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution." Nevertheless, with that cautionary knowledge, BP and the other Defendants continued their work, seemingly without exercising any additional caution, despite the known risks of performing delicate cementing work on a gas belch-prone well drilled in extremely deep water on a floating platform, with only one emergency BOP that might not even function because of the drilling depth.

59.     Defendant BP has a history of cutting corners on safety to reduce operating costs. In 2005, a huge blast at a Texas refinery killed 15 people and injured more than 170; federal investigators found the explosion was in part due to cost-cutting and poor facility maintenance. Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system. And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline. According to the Occupational Safety and Health Administration ("OSHA"), over the past three years, BP has committed 760 willful safety violations - a number made even more shocking when compared to the other large oil companies, who average about five violations each over the same period.

60.     Former employees and oil field workers at the subject rig who worked with BP have reported that BP regularly cheated on pressure tests and failed to report leaks and spills to the proper authorities. Most recently, reports revealed that BP is operating its Atlantis rig - a deepwater rig similar to the Deepwater Horizon - with incomplete and inaccurate engineering documents, which one official warned could "lead to catastrophic operator error" and disaster like the fate of the Deepwater Horizon rig.

61.     Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry. In 2009 and 2010, BP has spent more than $20 million lobbying the Federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

62.     Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon incident is a tragic example to the contrary.

13

63.    The explosion and fire on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of all the Defendants, which renders them jointly and severally liable to Plaintiffs and the Class Members for all their damages.

64.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, the Class Members, and the beachfront and coastal areas of Alabama and the Gulf Coast where Plaintiffs' and the Class Members' property is located. Moreover, additional safety mechanisms, technologies, and precautions were known and available to Defendants, but Defendants chose not to employ them on the Deepwater Horizon.

65.    After the explosion, Defendants collectively attempted to downplay and conceal the severity of the oil spill. BP's initial leak estimate of 1,000 barrels per day was found by later reports to be a small fraction of the actual leak amount of tens of thousands of barrels of oil per day. Moreover, Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill. More recently, Defendants have refused to let scientists accurately measure the plumes of oil beneath the surface to get a more specific reading on the size and rate of the spill.

66.    At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters. Although BP has begun drilling a relief well to stop the flow to the leaking well, the relief well will take months to complete, while oil continues to flow out of the leaking well. The volume of this continuous gush of oil has already eclipsed that of the Valdez spill, ensuring this spill's classification as the worst oil spill in history.

67.    Oil has already soiled the beaches of Dauphin Island, Alabama, prompting state health officials to close the beaches and prohibit swimming. As the oil continues to make landfall along the

Gulf Coast, it will cause continued severe damage to the white sand beaches that line the coasts of Alabama, destroying their natural beauty and diminishing the value of beachfront property.

68.     The Gulf Coast ranks number one among the nation's destinations for Americans that swim, fish, dive, and otherwise enjoy the region's many beaches, coastal wetlands, and shores. There are over 550,000 seasonal or vacation homes or housing units along the Gulf coast of which Plaintiffs' home is included. More than 20 million  visitors enjoy the Gulf coast beaches each year.

69.     The timing of this disaster makes it even more damaging as it is now the summer tourist and vacation season. The physical and reputationa1 sullying of the Gulf coast's pristine beaches has already resulted in cancellations of pre-booked trips. Because of the spilled oil, vacationers, beachgoers and boaters are avoiding the region and planning their trips to other destinations instead.

70.     The stigma of the spill may last even longer than the actual oil damage does, further affecting the coastal economy for years to come. Experts estimate the spill will cost the Gulf coast tourist industry $4 billion in economic losses.

71.     The oil spill and the resulting contamination have caused and will continue to cause the Plaintiffs and other home owners loss of property value, rental value, and rental income for properties located on the Gulf of Mexico and Alabama's shore.

72.     Plaintiffs jointly own one condominium in Gulf Shores, Alabama at the Grand Caribbean Resort. As of the filing of this complaint, they have lost personal enjoyment and potential rentals due to the oil spill.

73.     The Plaintiffs' purchased said property immediately prior the time of the oil spill. They have been informed that the value of their property has dropped substantially from the pre-spill value.

74.     There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

**V. CLASS DEFINITION**

15

75.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, who are members of the following Class:

All owners of real property adjacent to the Gulf of Mexico on the southern shore of the State of Alabama who claim injury and/or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the Deepwater Horizon drilling rig and the resulting oil spill.

76.     Excluded from the Class are:

(a)      the officers and directors of any of Defendants;

(b)      any judge or judicial officer assigned to this matter and his or her immediate family;

(c)      any individual who has claims for personal physical, bodily injury as a result of the April 20, 2010 explosion and fire that is the subject of this action; and

(d)      any legal representative, successor, or assign of any excluded persons or entities.

## VI. CLASS ACTION ALLEGATIONS

77.     Plaintiffs' claims are made on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

**A. Numerosity of the Class**

78.     On information and belief, the Class consists of thousands of individuals and/or businesses who have been legally injured by the disaster, making joinder impracticable.

**B. Typicality and Commonality**

79.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, have suffered adverse effects proximately caused by the disaster.

80.     Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.

**C. Adequacy**

81.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in complex class actions.

82.     Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**D. Predominance of Common Questions of Fact and Law**

83.     There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

(a)     Whether Defendants caused and/or contributed to the explosion, fire, and oil spill;

(b)     Whether Defendants were negligent in the design, maintenance, manufacture, and/or operation of the of the oil rig, its pipes, valves, and other machinery and materials;

(c)     Whether Defendants knew or should have known of the risk of a major failure of the rig such as that which caused it to fail and resulted in the explosion, fire, and oil spill;

(d)     Whether Defendants knew of, or should have utilized, all available safety mechanisms to prevent a blowout and/or seal the wellhead;

(e)     Whether Defendants knew or should have known that their activities would cause damage to Plaintiffs;

(f)     Whether Defendants acted maliciously or with reckless disregard to the risk of a major failure of the rig, its pipes, valves, and other machinery and materials; and

(g)     The amount of damages Plaintiffs and the Class Members should receive in compensation.

**E. Superiority**

84.     Absent class treatment, Plaintiffs and Class Members will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

17

85.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex environmental cases such as this, few could likely seek their rightful legal recourse. Absent a class action, Class Members would continue to incur harm without remedy.

86.     The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

## FIRST CLAIM FOR RELIEF

### Trespass

87.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

88.     Defendants jointly caused the discharge of  polluting matter beyond the boundary of the Plaintiffs' and Class Members' property in such a manner that, it was reasonably foreseeable that the pollutant would, in due course, invade Plaintiffs' and Class Members' property and cause harm.

89.     By discharging polluting matter, Defendants entered, invaded, and intruded on the properties of Plaintiffs and the Class Members without privilege, permission, invitation, or justification.

90.     Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class Members' properties. Defendants also owed a duty to Plaintiffs and members of the Class to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

91.     Defendants had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work.

92.     Defendants breached the duty they owed to Plaintiffs and members of the Class when they failed to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon, which conduct resulted in entry, intrusion, or invasion on Plaintiffs' and Class Members' properties.

93.      Defendants knew or should have known that their conduct would foreseeab1y result in a disastrous blowout and oil spill, causing damage to the properties and economic interests of persons in the area affected by the spill.

94.     As a direct and proximate result of Defendants' trespass, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income and other economic loss.

95.     Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

## SECOND CLAIM FOR RELIEF

### Nuisance

96.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

97.     Defendants' conduct has directly and proximately resulted in continuing and unreasonable interference with the use and enjoyment of properties owned by Plaintiffs and Class Members and constitutes a nuisance.

98.     Defendants' inadequate manufacture, maintenance and operation of the Deepwater Horizon was unreasonable.

99.     As a direct and proximate result of Defendants' unreasonable conduct, Plaintiffs and Class Members have suffered unreasonable or substantial annoyances and unreasonable or substantial interference with the use and enjoyment of their properties, including, but not limited to, extensive

destruction and contamination of their real and personal property and environment, resulting in damage in an amount to be proven at trial, including, but not limited to, real and personal property damage, diminution of value of real estate, loss of income and other economic loss, and loss of enjoyment of real property.

100.    As a direct and proximate result of the permanent nuisance created by Defendants, Plaintiffs and Class Members have suffered actual and threatened legal injury for which there is no adequate remedy at law, making preliminary and final injunctive relief appropriate.

### THIRD CLAIM FOR RELIEF

### Negligence

101.     The allegations in all previous paragraphs are incorporated by reference as though fully set forth here.

102.    Defendants owed a duty to all Plaintiffs and Class Members to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

103.    Defendants had a heightened duty of care to all Plaintiffs and the Class Members because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work.

104.    Defendants breached that duty when they failed to take appropriate steps to ensure the safety and integrity of the drilling platform and the BOP valves.

105.    As a direct and proximate result of Defendants' failure take appropriate steps to ensure the safety of the Deepwater Horizon, Plaintiffs and the Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to diminution of value of real estate, loss of income and other economic loss, and loss of enjoyment of real property.

106.    The blowout explosion, fire, and resulting oil spill were caused by the joint negligence of the Defendants.

20

107.    Upon information and belief, Plaintiffs allege that the disaster was the result of Defendants'

joint negligence in:

(a)    Failing to properly maintain and/or operate the Deepwater Horizon;

(b)    Operating the Deepwater Horizon in such a manner that an explosion and fire occurred

onboard, causing it to sink and resulting in an oil spill;

(c)    Failing to properly inspect the Deepwater Horizon to assure that all equipment and personnel

were fit for their intended purpose;

(d)    Acting in a careless and negligent manner;

(e)    Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe

operations of the Deepwater Horizon, which would have prevented the disaster;

(f)    Failing to take appropriate action to avoid or mitigate the accident;

(g)    Negligently implementing policies and procedures to safely conduct offshore operations in

the Gulf of Mexico;

(h)    Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or

in proper working order;

(i)    Failing to timely warn;

(j)    Failing to timely bring the oil release under control;

(k)    Failing to provide appropriate disaster prevention equipment;

(1)    Acting in a manner that justifies imposition of punitive damages; and

(m)    Such other acts and omissions as will be shown at the trial of this matter.

108.    The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the

fact that Defendants failed to take necessary actions to mitigate the danger associated with their

operations.

109.    Furthermore, the disaster would not have occurred had the Defendants exercised a

21

high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

110.     Plaintiffs and the Class Members are entitled to a judgment finding Defendants

liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' acts

and omissions.

## FOURTH CLAIM FOR RELIEF

### Wantonness

111.     Plaintiffs, on behalf of themselves and the Class Members, reallege each and

every allegation set forth above.

112.     Defendants owed a duty to all Plaintiffs and Class Members to exercise reasonable care in the

manufacture, maintenance, and operation of the Deepwater Horizon.

113.     Defendants had a heightened duty of care to all Plaintiffs and the Class Members because of

the great danger associated with deep drilling from floating platforms, and the especially high risk of

blowouts during cementing work such as that Deepwater Horizon was performing at the time of the

explosion.

114.     Defendants breached their legal duty to Plaintiffs and the Class, failed to exercise reasonable

care, and acted with reckless, willful, and wanton disregard for the property and economic interests

of others, including Plaintiffs and the Class Members, in the negligent manufacture, maintenance,

and/or operation of the Deepwater Horizon.

115.     Defendants knew or should have known that their wanton or reckless conduct would

foreseeably result in a disastrous blowout and oil spill, causing damage to the property and economic

interests of individuals and businesses in the area affected by the oil spill.

116.     As a direct and proximate result of Defendants wanton or reckless conduct, Plaintiffs and

Class Members have suffered legal injury and damages, in an amount to be proven at trial, including,

but not limited to diminution of value of real estate, loss of income, and other economic loss and loss of enjoyment of real property.

117.     Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

## FIFTH CLAIM FOR RELIEF

### Negligence *Per Se*

118.     Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

119.      Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state and federal laws, and permits issued under the authority of these laws.

120.     These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and the Class Members.

121.     Defendants' violations of these statutory standards constitute negligence *per se* under Alabama law.

122.     Defendants' violations of these statutory standards proximately caused Plaintiffs' and the Class Members' injuries, warranting compensatory and punitive damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants, jointly and severally, as follows:

A.     An order certifying the Class as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

B.     Economic and compensatory damages in amounts to be determined at trial;

C.     Punitive damages;

D.      Injunctive relief against Defendants;

E.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

F.      Attorneys' fees and costs; and

G.      Such other and further relief available under all applicable state and federal laws

and any relief the Court deems just and appropriate.


## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.


Respectfully submitted,


 /s/ Kearney Dee Hutsler
KEARNEY DEE HUTSLER, ESQ
One of the Attorneys for Plaintiffs & Class
2700 Hwy. 280, Suite 320W
Birmingham, AL 35223
Phone No. (205) 414-9979
Fax No. (205) 879-9229
Email kdhlaw@hotmail.com

R. Stephen Griffis
One of the Attorneys for Plaintiffs & Class
2100 Riverhaven Drive, Ste. 1
Birmingham, AL 35244-1218
Phone  (205) 402-7476
Fax No. (205) 402-7292

Charles M. Thompson
One of the Attorneys for Plaintiffs & Class
5615 Canongate Lane
Birmingham, Alabama 35242
Phone No. (205) 995-0068
Fax No. (205) 995-0078

*Attorneys for Plaintiffs and the Class*

24

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of July, 2010. I have forwarded a true and correct copy of the foregoing via electronic mail to the court clerk and by first class mail with summons to the Defendants, to the following:

**CLERK OF THE COURT**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**
113 St. Joseph St.
Mobile, AL 36602

BP Products North America, Inc.
through its agent for service of process
CSC-Lawyers Incorporating Service
150 South Perry Street
Montgomery, AL 36104

Cameron International Corporation
through its agent for service of process
C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

BP, PLC
1 St. James's Square
London
SW1Y 4PD
United Kingdom

BP Exploration &Production, Inc.
through its agent for service of process
C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

BP Corporation North America, Inc.
through its agent for service of process
Prentice Hall Corp System
150 South Perry Street
Montgomery, AL 36104

BP Company North America, Inc.
through its agent for service of process
The Prentice-Hall Corporation System, Inc.
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

BP America, Inc.
through its agent for service of process
C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Anadarko Petroleum Corp
through its agent for service of process
C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Transocean Offshore Deepwater Drilling, Inc.
through its agent for service of process
Capitol Corporate Services, Inc.
150 South Perry Street
Montgomery, AL 36104

Transocean, Ltd.
Turmstrasse 30
CH-6300 Zug
Switzerland

Transocean, Inc.
US Office
4 Greenway Plaza
Houston, TX 77046

Transocean, Inc.
70 Harbour Drive, Floor 4
P.O. Box 10342
George Town, Grand Cayman
Cayman Islands KY-1003

Transocean Deepwater, Inc.
through its agent for service of process
Capitol Services, Inc.
615 South Dupont Highway
Dover, DE 19901

Moex Offshore 2007 LLC
through its agent for service of process
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

M-I LLC
through its agent for service of process
Capitol Corporate Services, Inc.
150 South Perry Street
Montgomery, AL 36104

Halliburton Energy Services, Inc,
through its agent for service of process
C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

/s/ Kearney Dee Hutsler
Kearney Dee Hutsler